IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| JOHN R. HALL,                              : | |
|                                            : | |
|     Plaintiff,         : | |
|                                            : | |
|     v.                 : | CIVIL ACTION NO. |
|                                            : | 1:06-CV-0607-JOF |
| NORFOLK SOUTHERN RAILWAY                   : | |
| COMPANY, a corporation, et al.,            : | |
|                                            : | |
|     Defendants.        : | |

## OPINION AND ORDER

This matter is before the court on Defendant Butch Thompson Enterprises, Inc.'s motion for partial summary judgment [103-1] and Defendant Norfolk Southern Railway Company's motion for summary judgment [104-1].

**I.    Background**

    **A.    Procedural History**

Plaintiff, John R. Hall, an Alabama resident, filed suit against Defendants, Norfolk Southern Railway Co., Jacob Shepherd, and Butch Thompson Enterprises, Inc., on June 1, 2005. Plaintiff, an employee of Norfolk Southern Railway Co., alleges that on June 17, 2003, he was injured when the train he was working on collided with a truck driven by Shepherd and owned or leased by Butch Thompson Enterprises. Plaintiff contends he has

suffered permanent injury to his back as a result of the collision.  The accident occurred on the railroad track at the Norfolk Southern Railroad Crossing on Church Street in Cobb County, Georgia.  Plaintiff's complaint was originally filed in the United States District Court for the Northern District of Alabama but was transferred here in February 2006.

Plaintiff asserts a claim under the Federal Employers Liability Act ("FELA"), 45 U.S.C. § 51, *et seq.*, against Defendant Norfolk Southern.  Plaintiff raises state law claims against Defendants Shepherd and Butch Thompson Enterprises, Inc.  Plaintiff alleges that Defendant Shepherd "negligently and/or wantonly caused or allowed the motor vehicle he was driving to collide with the train the plaintiff was on" which proximately caused Plaintiff damages and that Defendant Butch Thompson Enterprises is vicariously liable for Defendant Shepherd's conduct.  Plaintiff asserts that Defendant Butch Thompson Enterprises "negligently, willfully and/or wantonly hired, trained and/or supervised" Defendant Shepherd which proximately caused Plaintiff's injuries.  Plaintiff also raises claims of negligent entrustment and negligent supervision against Defendant Butch Thompson Enterprises.  Plaintiff seeks only compensatory damages in the form of lost past wages, lost future wages, lost benefits, and pain and suffering; interest; and costs.  Plaintiff does not seek punitive damages.

AO 72A
(Rev.8/82)

**B.     Facts**

Plaintiff, John Hall, was a conductor employed by Norfolk Southern Railway Company on June 17, 2003, when he was working on a train bound from Birmingham, Alabama to Atlanta, Georgia via Austell, Georgia.  Shortly before noon on June 17, 2003, the train was approaching (from the west) a railroad crossing at Church Street in Mableton, Georgia, at approximately thirty miles per hour.  Between Austell and Atlanta, there are two parallel main line tracks.  The train was traveling on the south track, also called mainline no. 1.  The tracks approaching the Church Street crossing curve to the left at 2 degrees, 36 minutes.  Norfolk Southern's speed limit for freight trains in that area is 50 miles per hour.  Because of the curve, the outside or southerly rail of each track in the curve, must be "super elevated" above the inside or northerly rail.  "For a train to go safely around a curve, it is necessary to raise one rail higher than the other to offset the forces of gravity that naturally would occur on an object in motion going around a curve, same as on a highway."  *See* Becker Depo., at 51.  For class four track at a curve of 2 degrees 36 minutes, the super elevation called for in the Code of Federal Regulations is between 1.55 and 5.00 inches.  A survey of the site completed by Josh Lewis in December 2006 shows that the super elevation of the track at the Church Street crossing is 2.64 inches.

Norfolk Southern maintains certain portions of the pavement at the Church Street crossing.  David Becker, Norfolk Southern's Assistant Chief Engineer, testified that he

3

AO 72A
(Rev.8/82)

believed Norfolk Southern was responsible for paving "the distance of approximately two feet beyond the head of the tie of the closest track." *See* Becker Depo., at 36-37. Bruce Taylor, Norfolk Southern's Track Supervisor, testified that Norfolk Southern maintains the pavement at the Church Street crossing "[j]ust far enough to get outside the foul area of the track and do a reasonable tie-in with the county part of the road." *See* Taylor Depo., at 41. The "foul area of the track" is approximately four feet outside the rail. *Id.* Norfolk Southern would pave from somewhere between the foul area and just outside the foul area to tie in reasonably with the county road and might pave up to 20 feet outside the edge of the rail. However, he also stated that at the Church Street crossing, the area paved by Norfolk Southern was less than 20 feet. *Id.* at 44.

The survey performed by Mr. Lewis also shows that as Church Street approaches the railroad tracks, it is almost flat. As the street crosses the tracks, the pavement ascends approximately 13 inches from the outside of the north rail of the north tracks to the outside of the south rail on the southerly tracks. Then, the pavement is essentially level for more than two feet outside the south track, and only slopes approximately one inch to a point nine feet south of the tracks. In other words, there is a .71% grade from a point 11 feet south of the southernmost track traveling north toward track 1. The high point in the crossing is the south rail of the south track. From that point to the centerline of the north track is a 6.74% descending grade. Thus, the elevation change from the centerline of the road at the north

4

track to thirty feet south of the south track is 3.6 inches. The elevation change from the centerline of the road at the north track to fifteen feet south of the south track is 7.2 inches.

An American Association of State Highway and Transportation Officials (AASHTO) standard on Geometric Design of Highways and Streets stated:

> the crossing surface should be at the same plane as the top of the rails for a distance of 0.6m [2 ft] outside the rails. The surface of the highway should also not be more than 75 mm [3 in] higher or lower than the top of the nearest rail at a point 9 m [30 feet] from the rail unless track super elevation makes a different level appropriate.

*See* Hayes Depo., Exh 1.

Mr. Becker testified that he believed that the pavement south of the track was structured so as to allow a relatively level truck access for Barnes Hardware. *See* Becker Depo., at 25-26 ("given the site conditions, the approach to the crossing from the north downward met the crossing well, and going toward Bankhead Highway appeared to have a smooth transition to the adjacent roadway; and then that the roadway's transition into Bankhead Highway seemed to be surprisingly sharp"). Close to Bankhead Highway, "the road surface dipped to provide what appears to be access to the adjacent Barnes Hardware store parking lot, and then rather abruptly ascends toward Bankhead Highway." *Id.* at 27.

Either Cobb County or the Georgia highway department maintains the pavement south of the southernmost track mainline no. 1. Mr. Becker testified:

5

Q: [D]o you know who is responsible for tying in the Barnes Hardware driveway with this portion of pavement directly aside of it or adjacent to it (indicating)?

A: It would be my assumption that that driveway would be controlled by Cobb County since it's a – Cobb County would have responsibility for the road in front of the driveway.

*Id.* at 29. Mr. Becker further testified that it appeared the county was trying to protect Barnes Hardware and ended up "trying to do a little too much in too small of an area." *Id.* at 36; 47 (indicating that either the State Highway Department or Cobb County had accommodated the needed access from Church Street).

Mr. Taylor testified that Norfolk Southern had performed "timber" and "surfacing" or "T&S" work on track numbers 1 and 2 at the Church Street crossing in February and March of 2002. Timbering involves changing out the old crossties in the track and inserting new ones, while surfacing is the compaction of the rock around the ties that are put in. Mr. Taylor testified that the timbering and resurfacing activities raise the track by about one inch and that through a gradual process and "a lot of trains" by the end of two years, the track is compacted back down to where it was. Mr. Taylor also testified that resurfacing work was done on lines 1 and 2 in April 2005.

Tim Hayes, Norfolk Southern's Assistant Track Supervisor, testified that Norfolk Southern again performed timbering and resurfacing work on track number 1 in September 2002. Mr. Hayes testified that the T&S work can cause the track to be "pulled" up to half

an inch, but that the track settles with time back to where it originally lay. Norfolk Southern laid new rail on Track Number 1 in January 2006, and some resurfacing work was done at the Church Street crossing in March 2006.

On June 17, 2003, Jacob Shepherd, an employee of Butch Thompson Enterprises, Inc., was driving a tractor-trailer unit carrying a heavy equipment base roller on a 53-foot lowboy trailer south on Church Street. Mr. Shepherd testified that he did not know what his clearance was under the lowboy trailer. The tractor-trailer unit successfully crossed the first (north) set of tracks, but became stuck on the center of the asphalt prior to the second set of (south) tracks. A Cobb County police officer saw the trailer caught on the tracks. Mr. Shepherd was outside the trailer considering the situation and told the officer that the trailer was stuck, but that he anticipated being able to get it off the crossing. Mr. Shepherd was attempting to raise the lowboy of the trailer. The police officer radioed his dispatcher to tell him the crossing was blocked. Within seconds of this transmission, however, Mr. Shepherd heard the train horn indicating a train approaching from the west. The police officer ran along the tracks to signal the train to stop. As the train rounded the bend, the engineer saw the policeman and immediately put the train into "full emergency stop." The train was unable to stop in time and hit the lowboy between its front and rear axles.

7

Mr. Becker viewed photographs from the day of the incident and, himself, went to the crossing shortly before his deposition. When asked about the differences in the photos, Mr. Becker responded:

> The difference I noticed was that in the photos that were presumably from the time of the incident that the crossing had a surface that was asphalt and what we call timber headers next to the rail versus the current crossing type, which is asphalt with rubber insets. The asphalt and timber crossing, as we call it, was our former standard, and we have just transitioned to a use of a different product now. And I noticed that that was something my eyes keyed into. Other than that, I didn't see a vast difference in the site conditions at all.

*See* Becker Depo., at 60.

### C.     Contentions

Defendant Butch Thompson Enterprises filed a motion for summary judgment as to Plaintiff's claims of negligent hiring, negligent supervision, negligent entrustment and negligent supervisory control. Butch Thompson Enterprises asserts that because Plaintiff is not seeking punitive damages and because it has admitted the applicability of respondeat superior, Plaintiff's supervisory claims against Butch Thompson Enterprises are extinguished under Georgia law. Plaintiff does not oppose this partial motion for summary judgment.

Plaintiff's complaint against Norfolk Southern proceeds on two theories: (1) the Church Street railroad crossing was too high, causing the tractor-trailer to get stuck, and (2) the railroad failed to give the crew timely notice that the truck was stalled on the crossing.

Defendant Norfolk Southern Railway Company filed a motion for summary judgment contending that with respect to the crossing, Plaintiff has failed to provide evidence from which a jury could conclude that Norfolk Southern was negligent under FELA. Norfolk Southern also asserts that because the Cobb County police officer alerted his dispatcher to the presence of the trailer on the tracks only moments before the Norfolk Southern train approached, there is no evidence to show that the railroad failed to give the train crew timely notice that a truck was stalled on the crossing.

Defendant Butch Thompson Enterprises, Inc., responded to Norfolk Southern's motion arguing that Norfolk Southern was negligent in the manner in which the crossing was graded. Plaintiff adopted the arguments of Butch Thompson Enterprises without filing his own brief.[1] Neither Plaintiff nor Butch Thompson Enterprises responded to Norfolk Southern's motion for summary judgment as to whether the railway had informed the train crew of the stuck trailer in a timely fashion. Considering the lack of opposition and in light of the fact that the undisputed evidence shows that the police dispatcher was informed of the incident only moments before the train on which Plaintiff was working approached the scene, the court grants Norfolk Southern's motion for summary judgment as to the timely

---

[1] Because Plaintiff formally adopted the brief of Defendant Butch Thompson Enterprises, the court need not consider Norfolk Southern's argument that it has not been established that a co-defendant can oppose another defendant's motion for summary judgment in the absence of the plaintiff's opposition.

9

warning issue and discusses below Plaintiff's theory that the Church Street railroad crossing was too high.

## II.     Discussion

### A.     Butch Thompson Enterprises, Inc.

Defendant Butch Thompson Enterprises has admitted that Defendant Shepherd was a servant, employee, and/or agent of Defendant Butch Thompson Enterprises. Defendant Butch Thompson Enterprises also admits that respondeat superior applies in this situation because Mr. Shepherd was acting within the scope of his employment at the time of the accident. In its motion for partial summary judgment, Defendant Butch Thompson Enterprises asserts that Plaintiff's claims for negligent hiring, negligent supervision, negligent entrustment and negligent supervisory control fail because it has admitted the applicability of respondeat superior and Plaintiff is not seeking punitive damages. Plaintiff agrees that summary judgment is appropriate on his claims of negligent hiring, negligent supervision, negligent entrustment and negligent supervisory control.

> In Georgia, where a party has alleged both respondeat superior and negligent entrustment against an employer for the acts of its driver where no punitive damages are sought, we have stated that a defendant employer's admission of liability under respondeat superior establishes the liability link from the negligence of the driver . . . rendering proof of negligent entrustment unnecessary and irrelevant.

10

*Bartja v. National Union Fire Insurance Company of Pittsburgh*, 218 Ga. App. 815, 817 (1995). An exception to this general rule exists, however, where a plaintiff has a valid claim for "punitive damages against the employer based on its independent negligence in hiring and retaining the employee or entrusting a vehicle to such employee." *See*, *e.g.*, *Durben v. American Materials, Inc.*, 232 Ga. App. 750, 751 (1998).

Because Plaintiff is not seeking punitive damages and because Defendant Butch Thompson Enterprises has admitted respondeat superior, the court GRANTS Defendant Butch Thompson Enterprises' motion for partial summary judgment on Plaintiff's claims of negligent hiring, negligent supervision, negligent entrustment and negligent supervisory control.

### B. Norfolk Southern Railway Company

FELA provides:

> [E]very common carrier by railroad . . . shall be liable in damages to any person suffering injury while he is employed by such carrier . . . for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier . . . .

45 U.S.C. § 51; *see also Norfolk Southern Railway Company v. Sorrell*, 127 S. Ct. 799, 805 (2007). The "elements of a FELA claim are determined by reference to the common law." *Id.* Thus, a plaintiff must establish the common law elements of negligence, including duty, breach, foreseeability, and causation. *See Williams v. National R.R. Passenger Corp.*, 161 F.3d 1059, 1062 (7th Cir. 1998). "FELA holds railroads to a prudent-person standard of care

11

and a plaintiff who wishes to demonstrate that a railroad breached its duty must show circumstances that a reasonable person would foresee as creating a potential for harm." *Id.* (quotation and citation omitted).

"Under FELA, an employee who suffers an 'injury' caused 'in whole or in part' by a railroad's negligence may recover his or her full damages from the railroad, regardless of whether the injury was also caused 'in part' by the actions of a third party." *See Norfolk & Western Ry. Co. v. Ayers*, 538 U.S. 135, 165-66 (2003). The Supreme Court has stated that a "relaxed standard of causation applies under FELA." *See Consolidated Rail Corp. v. Gottshall*, 512 U.S. 532, 543 (1994) (citing *Rogers v. Missouri Pacific R. Co.*, 352 U.S. 500 (1957)).[2] "Under this statute, the test of a jury case is simply whether the proofs justify with reason the conclusion that employer negligence played any part, even the slightest, in producing the injury or death for which damages are sought." *Id.* However, the Court has also emphasized that FELA is not a workers' compensation statute. *Id.* "We have insisted that FELA 'does not make the employer the insurer of the safety of his employees while

---

[2] With respect for a standard of causation, the Supreme Court continues to debate the precise contours of its holding in *Rogers*. *See Norfolk Southern Railway Co. v. Sorrell*, 127 S. Ct. 799 (2007) (concurring opinions of Alito, J. and Ginsburg, J.). Similarly, *Kelson v. Central of Ga. R. Co.*, 234 Ga. App. 200 (1998), cited by Plaintiff in support of an elevated standard of care, has been disavowed by the Georgia Court of Appeals. *See Georgia Southern & Florida R. Co. v. Peters*, 284 Ga. App. 139 (2007) ("Our statement in *Kelson* that a railroad is required to exercise 'great care' is incorrect.").

12

they are on duty.  The basis of his liability is his negligence, not the fact that injuries occur.'" *Id.* (citing *Ellis v. Union Pacific R. Co.*, 329 U.S. 649, 653 (1947)).

As an initial matter, the court notes that Norfolk Southern argues that Plaintiff's claims are preempted by the Federal Railroad Safety Act ("FRSA"), which prescribes the manner in which tracks are to be maintained, repaired, and inspected.  However, the cases to which Norfolk Southern cites are cases involving matters of state tort law and not FELA.  As such, the court finds them distinguishable.  The court does note, however, that in *Lane v. R.A. Sims, Jr., Inc.*, 241 F.3d 439 (5th Cir. 2001), the court held that a FELA claim asserting that a train was traveling at excessive speeds causing a collision at a crossing, was preempted by the Federal Railroad Safety Act regulations which authorized the train to be traveling at that speed.  *Id.* at 442-43; *see also Waymire v. Norfolk & W. Ry. Co.*, 218 F.3d 773, 776 (7th Cir. 2000) (FELA excessive-speed claim inconsistent with FRSA's goal of national uniformity).  *But see Earwood v. Norfolk Southern Railway Co.*, 845 F. Supp. 880, 891 (N.D. Ga. 1993) (Murphy, J.) (holding that FRSA speed regulations did not preclude a FELA excessive-speed claim).  The court need not resolve this preemption issue because it concludes below that Plaintiff has not proffered evidence from which a jury could find in Plaintiff's favor on the FELA claim.

Generally speaking, as a driver approaches the Church Street crossing going south, there is a slight ascent as a vehicle crosses the tracks.  After the vehicle crosses the last track

13

(south mainline no. 1), the road descends as it approaches Bankhead Highway. Plaintiff has proffered no evidence of his own to demonstrate that the railroad crossing was too high. Rather, Plaintiff points to the testimony of Mr. Taylor and Mr. Becker, Norfolk Southern employees, as well as the survey of the crossing commissioned by Norfolk Southern. Construed in the light most favorable to Plaintiff, the testimony shows that the transition from the railroad crossing to Bankhead Highway was affected so as to allow a flat level entrance into a local business fronting on the crossing and that the transition was "surprisingly" steep.

Georgia law specifies that a railroad must "maintain such grade crossings in such condition as to permit the safe and reasonable passage of public traffic. Such duty of maintenance shall include that portion of the public road lying between the track or tracks and for two feet beyond the ends of the crossties on each side and extending four feet beyond the traveled way or flush with the edge of a paved shoulder, whichever is greater." O.C.G.A. § 32-6-190. Plaintiff proceeds on two theories: (1) under FELA, the railroad had a duty to maintain the Church Street crossing beyond the Georgia statutory duty, and (2) the portion of the railroad crossing within the area which the railroad was required to maintain was too high.

As described above, Mr. Taylor and Mr. Becker gave slightly different testimony as to how far out from the crossing Norfolk Southern would pave so as to make the transition

14

from the crossing to the roadway. Mr. Taylor's testimony is broader in the sense that he describes Norfolk Southern taking on responsibility for a greater area than Mr. Becker. Therefore, in the light most favorable to Plaintiff, the court considers Mr. Taylor's testimony on the matter. He stated that Norfolk Southern maintains the pavement at the Church Street crossing "[j]ust far enough to get outside the foul area of the track and do a reasonable tie-in with the county part of the road." *See* Taylor Depo., at 41. The "foul area of the track" is approximately four feet outside the rail. *Id.* Norfolk Southern would pave from somewhere between the foul area and just outside the foul area to tie in reasonably with the county road and might pave up to 20 feet outside the edge of the rail. However, he also stated that at the Church Street crossing, the area paved by Norfolk Southern was less than 20 feet. *Id.* at 44.

There is no evidence in the record to demonstrate that the transition of the Church Street crossing to Bankhead Highway was within the four feet foul area of the rail, and thus, that the railroad had a duty to maintain the area. According to the survey prepared by Mr. Lewis in December 2006, approaching the crossing from the north, the pavement ascends 13 inches as it crosses the two super-elevated rails. The pavement is then level for two feet past the southerly rail and crosstie. Then south of the mainline 1, the pavement descends 1.1 inches over the course of nine feet. Thus, the descent does not appear to begin in the portion of the crossing maintained by Norfolk Southern. Church Street is a Cobb County road. *See* Taylor Depo., at 42.

15

Plaintiff contends it is irrelevant that the transition of the railway crossing into Bankhead Highway is outside of the area which Norfolk Southern is required to maintain. Plaintiff argues that a jury could reasonably conclude that Norfolk Southern failed its duties under FELA "because the roadway on which the Church Street crossing is located – whether maintained by Norfolk Southern, Cobb County or some other entity – descends and then rather abruptly ascends towards Bankhead Highway." *See* Response, at 14-15; *see also* Response, at 16 (admitting that it was not Norfolk Southern's duty to design the roadway). The court disagrees with Plaintiff's assertion. The Supreme Court has specifically stated that FELA is not a workers' compensation statute. There must be an association of some kind of causation (although cases disagree as to the actual extent) between the railroad's actions and the employee's injuries. If Cobb County or an entity other than Norfolk Southern was responsible for the grading of the crossing outside the rail tracks, then no reasonable jury could conclude that Norfolk Southern caused Plaintiff's injuries.

Plaintiff, however, contends that under FELA, a railroad's duty to provide employees with a safe place to work extends to property over which third persons have a primary obligation to maintain, citing *Carter v. Union Railroad Co.*, 438 F.2d 208, 210-11 (3d Cir. 1971), *Chicago Great Western Ry. Co. v. Casura*, 234 F.2d 441, 447 (8th Cir. 1956), and *Almendarez v. Atchison T. & S. F. Ry. Co.*, 426 F.2d 1095 (5th Cir. 1970). The cases cited by Plaintiff, however, do not support this proposition. Those cases address situations where

16

a railroad employee was required as part of his job to enter premises of third parties. In *Carter*, the employee regularly worked at a General Motors plant. In *Casura*, the employee worked at a Swift Packing plant. Thus, the Supreme Court in *Shenker v. Baltimore & Ohio R. Co.*, 374 U.S. 1 (1963), held that the railroad has a non-delegable duty to provide employees with a safe place to work "even when they are required to go onto the premises of a third party over which the railroad has no control." *Id.* at 6.

In *Almendarez*, the plaintiff was part of a crew carrying a 200-pound piece of equipment over a railroad's right of way. While walking backwards, the plaintiff stepped into a depression adjacent to the tracks and twisted his back. On appeal, the railroad argued that the district court's jury instructions were too broad, and the court should have limited its "safe place to work" instruction to the place where the injury occurred. The Court of Appeals rejected this argument stating that the

> railroad's attempt to limit the 'safe place to work' doctrine to the place alleged to be the situs of the injury is frivolous. This is simply because an employer has, under the Act, the 'nondelegable duty to provide its employees with a safe place to work even when they are required to go onto the premises of a third party over which the railroad has no control. *Shenker v. Baltimore & O. R.R.*, 374 U.S. 1, 7 (1963). It is undisputed that the injury occurred on the railroad's property, all of which the railroad has the duty to inspect and maintain.

426 F.2d at 1098-99. Here, Plaintiff never entered the area of the crossing beyond the rail tracks. Further, unlike the situation in *Almendarez*, when considering Plaintiff's assertion

17

that the transition to Bankhead Highway was too steep, there is no evidence here that alleged deficiencies in the crossing were on the railroad's property.

Plaintiff next argues that the area between the rails was negligently maintained. Norfolk Southern responds that the range of super elevation of the track is described by federal regulation and that the Church Street crossing satisfies those regulations. Plaintiff, however, asserts that there is no competent evidence in the record as to what the super elevation of the track was at the time of the accident. That is, there is no evidence that the levels of the crossing noted during the December 2006 survey are the same as they were at the time of the accident. Plaintiff notes that timber and resurfacing work had been performed at the crossing in February, March, and September 2002. Mr. Hayes testified that such work could create one-half inch of "pull" until the track settles with time and the passage of trains. Mr. Taylor testified that the timber and surfacing work could raise the track by one inch. After the passage of about two years, the track would return to its original height. Further, new track was laid in January 2006 and additional surfacing work was done in March 2006. All of these activities took place before Mr. Lewis' survey in December 2006.

As Defendant points out, however, if the Lewis survey is not competent evidence as to the level of the track crossing at the time of the accident, then there is no evidence to put in front of a jury as to the track crossing. The fact that the trailer became stuck on the

18

crossing would not be sufficient evidence from which the jury could conclude the crossing or grade was too high. Significantly, no testimony was presented as to the clearance on the undercarriage of the lowboy trailer. Without being able to eliminate the trailer as the source of the problem, the jury could not conclude – based on the accident alone – that the railroad crossing was the cause of the accident. Furthermore, even considering the testimony of Mr. Taylor and Mr. Hayes as to the amount of "pull" created during timbering and resurfacing activities, the addition or subtraction of an inch of elevation would still fall within the range allowed by federal regulation for super elevation. Moreover, Mr. Becker testified that he did not see much difference in the site conditions between the pictures taken at the time of the accident and his personal observation of the crossing prior to his deposition.

Finally, Plaintiff's reference to the American Association of State Highway and Transportation Officials (AASHTO) standards is unavailing. As an initial matter, there has been no evidence or testimony indicating that the railroad must comply with those standards such that a failure to do so could be considered negligence *per se* under FELA. More importantly, the standards themselves recognize that track super elevation may make a different level appropriate. There is no dispute that the curve at the Church Street crossing requires track super elevation. Therefore, the surface dimensions listed in the AASHTO standard would not apply to the Church Street crossing.

19

For the foregoing reasons, the court GRANTS Defendant Norfolk Southern Railway Company's motion for summary judgment [104-1].

## III.  Conclusion

The court GRANTS Defendant Butch Thompson Enterprises, Inc.'s motion for partial summary judgment [103-1] and GRANTS Defendant Norfolk Southern Railway Company's motion for summary judgment [104-1].

The parties are DIRECTED to file a pretrial order within thirty (30) days from the date of this order.

**IT IS SO ORDERED** this 18th day of September 2007.

                                              s/ J. Owen Forrester
                                              J. OWEN FORRESTER
                         SENIOR UNITED STATES DISTRICT JUDGE